Slip Op. 12-114

UNITED STATES COURT OF INTERNATIONAL TRADE

GLOBE METALLURGICAL INC.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Leo M. Gordon, Judge

Consol. Court No. 10-00032

**OPINION**

[Results of remand of administrative review sustained.]

Dated: September 5, 2012

William D. Kramer, Martin Schaefermeier, DLA Piper LLP (US), of Washington, DC, for Plaintiff Globe Metallurgical Inc.

L. Misha Preheim, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant United States. With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Joanna V. Theiss, Of Counsel, Office of the Chief Counsel for Import Administration U.S. Department of Commerce.

Duane W. Layton, Sydney H. Mintzer, Margaret-Rose Sales, Mayer Brown LLP, of Washington, DC, for Defendant-Intervenors Shanghai Jinneng International Trade Co., Ltd. and Jiangxi Gangyuan Silicon Industry Co., Ltd.

Gordon, Judge: This consolidated action involves an administrative review conducted by the United States Department of Commerce ("Commerce") of the antidumping duty order covering silicon metal from the People's Republic of China ("China"). See Silicon Metal from the People's Republic of China, 75 Fed. Reg. 1,592 (Dep't of Commerce Jan. 12, 2010) (final admin. review) ("Final Results"); see also Issues and Decision Memorandum, A-570-806 (Dep't of Commerce Jan. 5, 2010)

available at http://ia.ita.doc.gov/frn/summary/PRC/2010-378-1.pdf (last visited September 5, 2012)[1] ("Decision Memorandum"). Before the court are the Final Results of Redetermination, Sept. 6, 2011, ECF No. 76, ("Remand Results"), filed by Commerce pursuant to Globe Metallurgical Inc. v. United States, 35 CIT ___, 781 F. Supp. 2d 1340 (2011). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[2] and 28 U.S.C. § 1581(c) (2006). For the reasons set forth below, the Remand Results are sustained.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence,

---

[1] All Commerce unpublished decision memoranda were last visited the date of this opinion.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2012). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2012).

## II. Discussion

Defendant-Intervenors, Shanghai Jinneng International Trade Co., Ltd. and Jiangxi Gangyuan Silicon Industry Co., Ltd. ("Respondents"), challenge Commerce's treatment in the Remand Results of a surrogate financial statement of FACOR Alloys Limited ("FACOR"), a ferroalloy producer in India, which was used by Commerce to calculate Respondents' selling, general and administrative expenses ("SG&A") for the margin calculation. Specifically, Respondents challenge as unreasonable Commerce's exclusion of FACOR's sale of a captive power plant as a non-routine transaction. See Def.-Intervenors' Comments on Final Results of Redetermination Pursuant to Remand, Oct. 14, 2011, ECF No. 80.

When calculating SG&A, Commerce includes "gains or losses incurred on the routine disposition of fixed assets . . . because it is expected that a producer will

periodically replace production equipment and, in doing so, will incur miscellaneous gains or losses. Replacing production equipment is a normal and necessary part of doing business." Stainless Steel Sheet and Strip in Coils from Mexico, 75 Fed. Reg. 6,627 (Dep't of Commerce Feb. 10, 2010); Issues and Decision Memorandum, A-201-822 (Feb. 3, 2010) cmt. 8 at 44, available at http://ia.ita.doc.gov/frn/summary/mexico/2010-2987-1.pdf ("SSSS in Coils from Mexico"). Commerce excludes from its SG&A calculation any resulting gains and losses from non-routine sales of fixed assets because they "do not relate to the general operations of a company." Id. In determining whether to include or exclude a fixed asset sale from SG&A, Commerce considers the nature and significance of the sale, and the relationship of the transaction to the general operations of the company. Id.

Commerce has applied this framework many times to various transactions, including: the sale of a pulp mill by a lumber producer (non-routine, excluded), Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 75,921 (Dep't of Commerce Dec. 20, 2004), Issues and Decision Memorandum, A-122-838 (Dec. 13, 2004) cmt. 9 at 56, available at http://ia.ita.doc.gov/frn/summary/canada/E4-3751-1.pdf; the sale of a shipping vessel by a rebar producer (non-routine, excluded), Certain Concrete Reinforcing Bars from Turkey, 70 Fed. Reg. 67,665 (Dep't of Commerce Nov. 8, 2005), Issues and Decision Memorandum, A-489-807 (Nov. 2, 2005) cmt. 25 at 83, available at http://ia.ita.doc.gov/frn/summary/turkey/05-22242-1.pdf; the sale of a sawmill by a lumber producer (non-routine, excluded), Issues and Decision Memorandum accompanying Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 73,437

(Dep't of Commerce Dec. 12, 2005), Issues and Decision Memorandum, A-122-838 (Dec. 5, 2005), cmt. 8 at 38, available at http://ia.ita.doc.gov/frn/summary/canada/05-23932-1.pdf ("Softwood Lumber Products from Canada 2003-04"); the sale of a warehouse by a stainless steel producer (non-routine, excluded), SSSS in Coils from Mexico, cmt. 8 at 45; the sale of land for corporate headquarters by a PET film producer (non-routine, excluded), Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea, 75 Fed. Reg. 70,901 (Dep't of Commerce Nov. 19, 2010), Issues and Decision Memorandum, A-580-807 (undated), cmt. 3 at 6, available at http://ia.ita.doc.gov/frn/summary/korea-south/2010-29271-1.pdf; the sale of timber tracts by a lumber producer (routine, included), Softwood Lumber Products from Canada 2003-04, cmt. 40 at 111; and the sale of certain production equipment by an orange juice producer (routine, included), Certain Orange Juice from Brazil, 76 Fed. Reg. 50,176 (Aug. 12, 2011), Issues and Decision Memorandum, A-351-840 (Aug. 5, 2011), cmt. 7 at 21, available at http://ia.ita.doc.gov/frn/summary/brazil/2011-20563-1.pdf.

In Softwood Lumber Products from Canada 2003-04 Commerce explained the difference between the routine disposition of a fixed asset and the disposition of an entire facility:

> It is the Department's practice to include gains or losses incurred on the routine disposition of fixed assets in the G&A expense ratio calculation. The Department follows this practice because it is expected that a producer will periodically replace production equipment and, in doing so, will incur miscellaneous gains or losses. Replacing production equipment is a normal and necessary part of doing business. The costs associated with assets currently being used in production are recognized, and become part of the product cost, through depreciation expenses. The Department includes such gains and losses from the routine disposal of

assets in G&A expense rather than as a manufacturing expense, because the equipment, having been removed from the production process prior to the sale or disposal, is not an element of production when the disposal or sale takes place. It rather is simply a miscellaneous asset awaiting disposal. The gains or losses on the routine disposal or sale of assets of this type relate to the general operations of the company as a whole because they result from activities that occurred to support on-going production operations. In short, it is a cost of doing business. The Department's approach for these types of gains and losses is to allocate them over the entire operations of the producer.

We disagree with Abitibi that the question is whether the closed or sold facility pertains to the merchandise under review. Once a facility is sold or shut-down, by definition it no longer relates to the ongoing or remaining production, and it becomes either an asset owned by another party or an asset awaiting sale or disposal. Prior to the sale or shut-down, the cost of the facility would be allocated to the products produced at that facility in the form of depreciation expenses. Post shutdown or sale, the associated cost no longer is a direct or indirect production cost. The question is whether such costs are appropriate for inclusion in G&A expenses and relate to the company as a whole. The policy of not basing our decision on whether the facility in question produced the merchandise under review or merchandise not under review is consistent with our treatment of such costs in past cases.

As discussed above, these respondents either sold or shut down entire production facilities during the POR. These respondents are in the business of producing and selling commercial goods to customers: they are not the business of manufacturing and selling entire production facilities. From a cost perspective, it would not be reasonable to assign the gain or loss on the disposition of a facility to the per-unit cost of manufacturing of the products that are still being produced at the respondent's other facilities, because the facility in question now has nothing to do with producing the respondent's products. The question, again, is whether the shut-down and sale, or the outright sale, of a production facility supports the general operations of the company. The reason for including financial and G&A expenses in COP or CV is that companies incur various costs and expenses, apart from those associated with production operations, to maintain and generally support the company. . . .

Moreover, we disagree with the petitioner that the permanent closure or sale of a production operation is routine and the type of transaction that

> should be picked up as part of G&A expense. The sale of an entire production facility is a significant transaction, both in form and value, and the resulting gain or loss generates non-recurring income or losses that are not part of a company's normal business operations, and are unrelated to the general operation of the company. The sale of an entire production facility does not support a company's general operations, rather it is a sale or removal of certain production facilities themselves. It represents a strategic decision on the part of management to no longer employ the company's capital in a particular production activity. These are transactions that significantly change the operations of the company. If the task before the Department is to determine a particular producer's cost to manufacture a given product (including the costs associated with financing and supporting the producer's general operations) it is not reasonable to include gains or losses on the sale of an entire production facility as a product cost.
>
> While the Department has included such gains and losses in the past, in more recent cases, we have changed our practice and excluded the gains and losses associated with plant closures and sales. . . .

Softwood Lumber Products from Canada 2003-04, cmt. 8 at 33-35. Commerce echoed this explanation in SSSS in Coils from Mexico:

> The sale of an entire warehouse does not support a company's general operations. Rather, it represents a strategic decision on the part of management to no longer employ the company's capital in a particular production activity. These are transactions that significantly change the operations of the company and are non-routine in nature. From a cost perspective, it would not be reasonable to assign the gain or loss on the disposition of an entire facility to the per-unit cost of manufacturing of the products that are still being produced at the respondent's other facilities, because the facility in question now has nothing to do with producing the respondent's products. . . .
>
> . . .
>
> Mexinox is in the business of manufacturing and selling stainless steel products and not in the business of selling warehouses.

SSSS in Coils from Mexico, cmt. 8 at 45.

In the Remand Results Commerce reasoned that FACOR's sale of its captive power plant was not a routine disposition of production equipment, but a non-routine disposition of a complete production facility:

> A functioning power plant is a type of production facility, and therefore, its sale is more similar to the sale of an ongoing business line (such as the Kraft pulp mill in Softwood Lumber from Canada 2002-2003 or the shipping line in Concrete Reinforcing Bar from Turkey) than the routine disposition of equipment or machinery. Since FACOR's primary business activity is the production and sale of ferrochrome, its sale of a power-producing facility is non-routine in nature, and unrelated to its general operations. This is consistent with the determinations cited by Respondents. In SSSS from Mexico, the Department excluded profits on the sale of an entire warehouse from SG&A, stating that the sale of its warehouse "does not support a company's general operations." Likewise, in PET Film from Korea, the Department excluded profits on the sale of land, because selling land was not part of its normal business operations. As noted above, FACOR is in the business of producing and selling ferroalloys, not power plants. The Department's treatment of the sale of the power plant as non-routine is consistent with past practice.
>
> Further, in its Draft Remand Results, the Department cited to the large change in profit on the sale of the fixed asset between the prior and current period merely as supporting evidence that FACOR's sale of a power plant was an unusual, non-routine transaction. Slight fluctuations in the profits and losses realized by companies from year to year are to be expected, however, in this case, FACOR's profits on the sales of fixed assets increased over 1000% year-over-year (from the 2006-2007 accounting period to the 2007-2008 accounting period). This sizeable increase in profits on the sale of fixed assets is indicative of an unusual transaction, and FACOR's financial statements show that the unusual transaction accounting for this change is the company's sale of an entire power plant in the current period. Contrary to the Respondents' argument, the consideration of the change in profit was but one part of the evidence which the Department considered in its determination that the sale of the power plant is non-routine.
>
> Second, with respect to the significance of FACOR's sale of its power plant, we continue to find that FACOR's sale of a power plant was a significant transaction in both form and value. We disagree with Respondents' interpretation of Softwood Lumber from Canada *2003-2004*

as requiring that only the sale of a production facility can be categorized as non-routine. For instance, in Reinforcing Bars from Turkey, the Department excluded the profit from the sale of shipping vessels from SG&A, and in SSSS from Mexico, the Department excluded the profit from the sale of a warehouse, which are not production facilities. Moreover, an entire power plant is a type of production facility. The Department does not require a demonstrable change in the operations of the company to consider the sale of a plant or facility to be significant in form. The primary business lines of respondents whose asset sales were determined to be non-routine in Softwood Lumber from Canada 2002-2003, Softwood Lumber from Canada 2003-2004, and Concrete Reinforcing Bars from Turkey all continued with no minor changes after the non-routine sales of fixed assets, as is the case of FACOR.

FACOR's sale of a power plant was also significant in value. As Petitioner has noted, FACOR's power plant accounted for over 50 percent of the book value of its fixed assets, and even when considering the accumulated depreciation of the power plant, the power plant in question still represented over 40 percent of the company's total fixed assets, calculated on the same basis. Moreover, the Department has not determined that the significance of a transaction must be determined by examining its proportion of total revenue, nor has the Department set a lower limit for the percentage of total revenue that an asset sale must reflect in order for the sale to be considered non-routine. Although Respondents rely on Chlorinated Isos Prelim in support of their argument that the Department should consider the sale to be not significant, in Chlorinated Isos Prelim, the Department did not explain why it determined to treat the profits from the sale of a fixed asset as an offset to SG&A. This issue was also not discussed in the final results. Therefore, this determination does not support Respondents' contention that, where a sale of a fixed asset results is a small percentage of total revenue, the Department must treat the sale as routine.

The Department also continues to find that the sale of a surplus asset may also be significant. The simple fact of a company stating that it has excess capacity does not preclude a transaction from being considered significant. A surplus asset is one that is no longer needed by the company, not necessarily an asset that is insignificant to the company in terms of its productive capacity and value, or one that a company routinely sells.

With respect to the relationship of FACOR's sale of its power plant to its general operations, we continue to find that the sale of the power

> plant was not related to the general operations of FACOR. Again, a power plant is a production facility, and whether or not the products and services produced by the production facility are used in the manufacture or sale of the company's primary product, the sale of a production facility remains outside the scope of the company's primary, general business. We continue to find that whether or not power plants are commonly owned by ferroalloy producers is not determinative of whether the sale of a power plant is routine or not.
>
> Many categories of businesses are likely to possess certain manufacturing facilities that are not directly related to their primary business line - whether the "side" line be the production of Kraft pulp or the provision of shipping. The commonality between these examples and a power plant is that each of these facilities generates output of a product or service - paper, transport, or power - that is outside the scope of the company's primary business line. These unrelated goods and services may be employed in the manufacture of the company's own products - such as the shipping services the respondent provided for its own inputs and outputs instead of contracting a shipping company in Concrete Reinforcing Bars from Turkey - or they may be sold for profit to customers. The way the outputs of a productive manufacturing facility are employed by a specific company are not determinative of whether the sale of the asset is routine.

Remand Results at 13-16.

Respondents' contend that if properly applied, Commerce's practice governing fixed asset sales should yield only one reasonable outcome: FACOR's power plant sale must be included as a routine transaction in the SG&A calculation. Respondents do a creditable effort briefing their case, although it simply is too difficult a case to make. Unlike in the market economy context where a respondent benefits from the wisdom and insight of its own accountants analyzing its own fixed asset sales, here, Respondents (along with Commerce and petitioner) are interpreting the power plant sale through the limited information provided in surrogate financial statements. Against such an administrative record (which does not specifically detail the frequency with

which Indian ferroalloy producers buy or sell entire power plants), and against the litany of Commerce decisions excluding comparable fixed asset transactions, it is too tall an order for the court to direct Commerce via affirmative injunction to include the power plant sale within its SG&A calculation. Such an order would have to explain how the sale of an entire power plant by ferroalloy producers, not in the business of selling power plants, amounts to an insignificant, routine transaction, and further, why that determination is the only outcome that the administrative record reasonably supports. The standard of review contemplates that more than one reasonable outcome is possible on a given administrative record, and Commerce's decision here to exclude the power plant sale from its SG&A calculation is consistent with its past practice and certainly is as reasonable, if not more so, than Respondents' proposed alternative. The court must therefore sustain the Remand Results.

## IV. Conclusion

For the foregoing reasons the court sustains Commerce's Remand Results. Judgment will be entered accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: September 5, 2012
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| GLOBE METALLURGICAL INC., Plaintiff, v. UNITED STATES, Defendant. | Before: Leo M. Gordon, Judge<br>Consol. Court No. 10-00032 |
|---|---|

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered opinions; now in conformity with those opinions, it is hereby

**ORDERED** that final results of the 2007-08 administrative review of the antidumping duty order covering certain silicon metal from the People's Republic of China. Silicon Metal from the People's Republic of China, 75 Fed. Reg. 1,592 (Dep't of Commerce Jan. 12, 2010) (final results admin. review), are sustained, except for the matters covered by the Final Results of Redetermination (Dep't of Commerce Sept. 6, 2011) ("Remand Results"); it is further

**ORDERED** that the Remand Results are sustained; and it is further

**ORDERED** that the subject entries enjoined in this action, see Globe Metallurgical Inc. v. United States, Consol. Court No. 10-00032 (CIT Mar. 1, 2010) (order granting consent motion for preliminary injunction), ECF No. 11, must be liquidated in accordance with the final court decision, including all appeals, as provided for in Section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2006).

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: September 5, 2012
New York, New York